## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS,
## EASTERN DIVISION

|  |  |
|---|---|
| IN RE:<br><br>VENTANA HILLS ASSOCIATES, LTD,<br>an Ohio limited partnership,<br><br>                     Debtor. | Chapter 11<br><br>Case No. 09-41755<br><br>Hon. Pamela S. Hollis<br><br>Hearing Date:  November 17, 2009<br>Hearing Time: 10:00 a.m. |

### NOTICE OF MOTION

TO:     See Attached Service List

PLEASE TAKE NOTICE that on November 17, 2009 at 10:00 a.m. or as soon thereafter as counsel may be heard, I shall appear before the Honorable Pamela S. Hollis, Bankruptcy Judge, in Courtroom 644 of the U.S. Courthouse, 219 South Dearborn Street, Chicago, Illinois, or in her absence, before such other Judge who may be sitting in her place and stead and hearing bankruptcy motions, and shall then and there present VENTANA HILLS ASSOCIATES, LTD's MOTION FOR ENTRY OF AN ORDER PURSUANT TO RULE 1015(B) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE DIRECTING JOINT ADMINISTRATION OF CASES, a copy of which is attached and herewith served upon you, and shall pray for the entry of an order in conformity with the prayer of said pleading.

AT WHICH TIME AND PLACE you may appear if you so see fit.

VENTANA HILLS ASSOCIATES, LTD.,

By:     /s/Richard H. Fimoff
       One of its Attorneys

RICHARD H. FIMOFF (#806844)
WILLIAM A. CASTLE, JR. (#6288893)
Robbins, Salomon & Patt, Ltd.
25 E. Washington Street, Suite 1000
Chicago, Illinois 60602
Telephone: (312) 782-9000
e-mail: rfimoff@rsplaw.com

DC1489

## CERTIFICATE OF SERVICE

Richard H. Fimoff certifies that he caused to be served a true copy of the above and foregoing notice and attached pleading upon William Neary, U.S. Trustee and Anglo Irish Bank Mortgage c/o Bryan Cave Law Firm, via electronically filing the foregoing with the Clerk of the Court using the CM/ECF system or, in the case of the Debtor's Top 20 Unsecured Creditors, by faxing or e-mailing (as specified on the service list) the above mentioned documents to same on the 11th day of November, 2009.


/s/ Richard H. Fimoff
Attorney for the Debtor

DC1489

**In re:** VENTANA HILLS ASSOCIATES
Case No. 09-41755
**Service List**

U.S. Trustee

William T. Neary
Office of the U. S. Trustee
219 S. Dearborn Street, Suite 873
Chicago, IL 60604
Email: USTPRegion11.ES.ECF@usdoj.gov
(by electronic notice through ECF)

Pre-petition Lender:

ANGLO IRISH BANK MORTGAGE
Bryan Cave Law Firm
161 North Clark Street, Suite 4300
Chicago, IL 60601-3315
E-mail: leslie.bayles@bryancave.com
(by electronic notice through ECF)

Top 20 Creditors:

Floor Designs Unlimited LLC
3330 Library Road
Pittsburgh, PA 15234
facsimile: 412-881-7848

Coatsworth Painting
117 Hoffman Road
Zelienople, PA 16066
via e-mail: 117coatsworth@comcast.net

Firedex
9133 Marshall Road
Cranberry Township, PA 16066
facsimile: 724.452.9400

JML Landscape Management
978 Route 910
Pittsburgh, PA 15238
facsimile: 412.767.5211

Assurance Agency Ltd.
PO Box 66056
Chicago, IL 60666-0056
via e-mail: dnelson@assuranceagency.com

Township of Robinson
PO Box 15539
Pittsburgh, PA 15244
facsimile: 412.788.8126

DC1489

North Street Properties Inc.
100 Field Drive, #110
Lake Forest, IL 60045
facsimile:  847-295-8604

General Electric Co.
PO Box 640506
Pittsburgh, PA 15264-0506
facsimile:  866.302.3361

Cauley Security Services
5777 Baum Blvd.
Pittsburgh, PA 15206-3745
facsimile:  412.661.7939

HD Supply Facilities Maint.
PO Box 509058
San Diego, CA 92150-9058
facsimile:  800.930.4930

Apartment Finder-Pittsburgh
Network Comm Inc.
PO Box 402168
Atlanta, GA 30384-2168
facsimile: 404.759.2296

Best Karpet Klean - Pittsburgh
1477 E. 357th Street
Eastlake, OH 44095
facsimile: 440.942.4917

Kurtanich
3001 Fallbrook Drive
Moon Township, PA 15108
e-mail: jimmy.nut@hotmail.com

US Power Wash
807 East Carson Street
Pittsburgh, PA 15203
e-mail: uspwash@yahoo.com

For Rent Magazine
75 Remittance Drive, #1705
Chicago, IL 60675-1705
facsimile: 425.486.5408

Duron Paints & Wallcoverings
2701 Smallman Street
Pittsburgh, PA 15222-4719
facsimile: 412.471.8564

Cort Business Services
1201 Brighton Road
Pittsburgh, PA 15233
facsimile: 412.322.3301

DC1489

Waste Management
625 Cherrington Parkway
Coraopolis, PA 15108
 facsimile: 412.893.4925

General Electric-Atlanta
PO Box 402271
Atlanta, GA 30384-2271
facsimile: 866.302.3361

Assurant Health
PO Box 790076
St. Louis, MO 63179-0076
e-mail: jill.dewitt@assurant.com

DC1489

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS,
EASTERN DIVISION

|  |  |  |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| | ) | Chapter 11 |
| VENTANA HILLS ASSOCIATES, LTD. | ) | |
| an Ohio limited partnership, | ) | Case No. 09-41755 |
| Debtor. | ) | |
| | ) | Hon. Pamela Hollis |
| | ) | |
| | ) | Hearing Date: November 17, 2009 |
| | ) | Hearing Time: 10:00 a.m. |

## DEBTOR'S MOTION FOR ORDER PURSUANT TO RULE 1015(B) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE DIRECTING JOINT ADMINISTRATION OF CASES

NOW COMES, Ventana Hills Associates, Ltd., ("Ventana Hills"), debtor and debtor in possession ("Debtor"), by and through its attorney, Richard H. Fimoff and William A. Castle, Jr., of Robbins, Salomon & Patt, Ltd., and files this motion (the "Motion") for entry of an order, pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 1015-1 of the Local Rules of the U.S. Bankruptcy Court in the Northern District of Illinois (the "Local Rules"), directing joint administration of the Debtor's case with that of *In re Ventana Hills Phase II, L.P.*, no. 09-41758, for procedural purposes only (Ventana Hills Associates, Ltd. and Ventana Hills Phase II, L.P., collectively referred to herein as "Debtors"). The facts and circumstances supporting this Motion are set forth below and supported by the Declaration of Ivan Djurin in Support of First Day Motions and Orders. In support of this Motion, Debtors respectfully represent as follows:

### JURISDICTION

1.      On November 3, 2009, Ventana Hills Associates, Ltd. and Ventana Hills Phase II, L.P. each filed their voluntary petitions for relief under Chapter 11 of Title 11 of the United States

1

Code, 11 U.S.C. § 101-1532 (as amended, the "Bankruptcy Code") with the United States Bankruptcy Court for the Northern District of Illinois (the "Court"), commencing the above-referenced Chapter 11 cases. The Debtor and Ventana Hills Phase II, L.P. continue to operate its businesses and manage their properties as debtors-in-possession pursuant to sections 1107(c) and 1108 of the Bankruptcy Code.

2.      No creditors' committee has been appointed in these cases.

3.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

4.      The Court is authorized to grant the relief requested pursuant to section 105(a) of Title 11 of the Bankruptcy Code and Rule 1015(b) of the Bankruptcy Rules and Rule 1015-1 of the Local Rules.

<b>BACKGROUND</b>

5.      The Debtors are co-owners and co-operators of a residential apartment project located in Pittsburgh, Pennsylvania, known as "Ventana Hills Apartments".

6.      Ventana Hills Apartments was constructed in 2002 as a rental apartment community, in two phases, and was purchased by the Debtors in 2004 for $50,000,000.00.

7.      Ventana Hills Apartments is comprised of 470 residential rental apartment units located in 30 buildings spread over 60 acres. In addition, the complex contains clubhouse and garage buildings.

8.      The Debtors' operational and profitability problems are principally due to the general economic problems of the country over the last several years which has resulted in periodic declines in occupancy levels, and the extended time required to bring occupancy levels back to

DA9692

proper levels. This has been exacerbated in Debtors' case by reason of fixed interest rate financing at levels substantially above current interest levels.

9.       The Debtors acknowledge that from time to time prior to the petition date, Debtors jointly borrowed money and received other financial accommodations from Anglo-Irish Bank Corporation Limited ("Bank"), under that certain Promissory Note dated January 26, 2007, in the   original principal amount of $53,125,000 (the "Bank Note") and that certain Loan Agreement dated January 26, 2007, which are secured by security interests and liens in and against the majority of the assets of the Debtors.

10.      The Debtors further acknowledge that the Bank has perfected its security interests and liens in and against the Debtors' assets by the recording of mortgages and/or the filing of financing statements and other documents as applicable in the appropriate filing and recording offices.

## RELIEF REQUESTED

11.      By this Motion, Debtors move for the joint administration, for procedural purposes only, of their respective cases.  The Debtors submit that joint administration, for procedural purposes only, is in the best interest of each of the Debtors and their estates and will ease the administrative burden on their creditors, this Court and other interested parties.

12.      Rule 1015(b) of the Bankruptcy Rules provides that if two or more petitions for relief are pending in the same court by or against a debtor and its affiliate, the court may order a join administration of the cases.  The debtors in these cases, Ventana Hills Associates, Ltd. and Ventana Hills Phase II, L.P. are affiliates, under the definition of "affiliate" in section 101(2) of the Bankruptcy Code.  Accordingly, the joint administration, for procedural purposes only, of the Debtors' chapter 11 cases is appropriate under Bankruptcy Rule 1015(c).

3

13.     Moreover, the Debtors' financial affairs and business operations are related, and joint administration will ease the administrative burden on the Court and all parties in interest. Additionally, many of the motions, hearings, and orders in the Debtors' chapter 11 cases will affect the others case, and its estate. Joint administration will reduce the fees and costs and avoid the need for filing duplicative documents in Ventana Hills Associates, Ltd.'s and Ventana Hills Phase II, L.P.'s cases.

14.     In order to optimally and economically administer the Debtors' pending chapter 11 cases, Ventana Hills Associates, Ltd.'s and Ventana Hills Phase II, L.P.'s cases should be jointly administered, for procedural purposes only, under the case number assigned to Ventana Hills Associates, Ltd. The Debtors propose to utilize Ventana Hills Associates, Ltd. as the lead case because Ventana Hills Associates, Ltd. is recognizable to the both its own and Ventana Hills Phase II, L.P.'s creditors and any other parties in interest and is the indirect corporate parent of Ventana Hills Phase II.

15.     Joint administration, for procedural purposes only, will not adversely affect the rights of the creditors of each of the respective debtors because this Motion only requests the administrative consolidation of the Debtors' estates.  The parties are not seeking substantive consolidation at this particular time. Any creditor may still file a claim against a particular debtor and its estate, or both Debtors and their respective estates. Thus, joint administration will enhance the rights of all creditors by enabling the Clerk of the Court to utilize a single docket and combine notices to creditors of Ventana Hills Associates, Ltd.'s and Ventana Hills Phase II, L.P.'s respective estates and other parties in interest, without impacting such parties' substantive rights.

4

16.     Joint administration will also enable participants in these cases to more easily apprise the various parties in interest of the matters before the court in all of the Debtors' respective chapter 11 cases.    Further, joint administration will relieve the Court of the burden of entering duplicative orders and maintaining duplicative files and will simplify the Office of the United States Trustee's ("the "U.S. Trustee") supervision and administrative aspects of the Debtors' chapter 11 cases. For these reasons, joint administration of the Debtors' chapter 11 cases, for procedural purposes only, will best serve the interests of the Debtors, their creditors, and other parties of interest.

17.     The Debtors request that he Court modify the caption of the Debtors' chapter 11 cases to reflect their joint administration as follows:

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS,
### EASTERN DIVISION

|  |  |
|---|---|
| **IN RE:** | |
| | **Chapter 11** |
| **VENTANA HILLS ASSOCIATES, LTD.** | |
| **an Ohio limited partnership, and VENTANA** | **Case No. 09-41755** |
| **PHASE II, LLC, an Ohio limited partnership,** | |
| | **(Jointly Administered)** |
| **Debtors.** | |

18.     The Debtors further request that the Clerk of Court enter a docket entry in each of the above-captioned cases substantially as follows:

An Order has been entered in this case under Rule 1015(b) of the Federal Rules of Bankruptcy Procedure directing the joint administration of the chapter 11 cases of Ventana Hills Associates, Ltd. and Ventana Hills Phase II, LLC. The docket of Ventana Hills Associates, Ltd., case no. 09-41755 should be consulted for all matters affecting this chapter 11 case.

19.     Finally, the Debtors seek authority to file monthly operating reports required by the United States Trustee Operating Guidelines on a consolidated basis for Ventana Hills Associates, Ltd. and Ventana Hills Phase II, LP., if the Debtors determine, after consulting with the U.S. Trustee, that consolidated reports would (1) increase administrative economy and efficiency in the Debtors' chapter 11 cases without prejudice to any party of interest, and (ii) accurately reflect the Debtors' business operations and financial affairs.

## NOTICE

20.     Notice of this Motion has been given to: (a) the Office of the United States Trustee; (b) Anglo Irish Bank, the sole prepetition Lender, and their respective counsel; and (c) the Debtor's twenty (20) largest unsecured creditors. In light of the nature of the relief requested, the Debtor submits that no further notice is required.

WHEREFORE, the Debtors respectfully request that the Court enter the order granting relief requested in the Motion, directing joint administration of the Debtor's case with that of Ventana Hills Phase II, L.P., no. 09-41758,  for procedural purposes only, and granting such further relief as is proper and just.

Respectfully submitted,

VENTANA HILLS ASSOCIATES, LTD., Debtor

/s/ Richard H. Fimoff
One of its Attorneys

Richard H. Fimoff (ARDC No. 804866)
William A. Castle, Jr. (ARDC No. 6288893)
Robbins, Salomon & Patt, Ltd.
25 E. Washington Street
Suite 1000
Chicago, IL 60602
312-782-9000
312-782-6690 (facsimile)

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS,
EASTERN DIVISION**

| | |
|---|---|
| IN RE:<br><br>**BERKLEY MANOR APARTMENTS, LP,**<br>**a Pennsylvania limited partnership,**<br><br>Debtor. | ) <br> ) <br> )   **Chapter 11** <br> ) <br> ) <br> )   **Case No. 09-41895** <br> ) <br> )   **Hon. Susan Sonderby** <br> ) <br> ) |

**AFFIDAVIT OF IVAN DJURIN
IN SUPPORT OF FIRST-DAY MOTIONS AND APPLICATIONS**

I, Ivan Djurin, pursuant to 28 U.S.C. § 1746, hereby deposes and states as follows:

### I. INTRODUCTION

1.    I have served as the managing member of the General Partner of the Debtor limited partnership ("Debtor") since its inception. I directly or indirectly own 85% of the equity in the Debtor. The Debtor's principal executive offices are located at 100 North Field Drive, No. 110, Lake Forest, IL 60045.

2.    I submit this Affidavit in support of the Debtor's various first-day applications and motions in its chapter 11 case (the "Case"). Except as otherwise indicated, all facts set forth in this Affidavit are based upon my personal knowledge, my review of relevant documents, or my opinion, based upon my experience and knowledge of the Debtor's operations and financial condition. If I were called upon to testify, I could and would testify competently to the facts set forth herein.

DB2192

3.    Part II of this Affidavit describes the Debtor's business and the circumstances surrounding the filing of the Debtor's chapter 11 petition. Part III sets forth the relevant facts in support of the Debtor's various first-day motions and application filed concurrently with this Affidavit.

4.    This Affidavit is submitted in support of, and to explain to the Court, the Debtor's need for the relief requested in the various first-day motions and applications filed with the Court in connection therewith. Any capitalized term not expressly defined in this Affidavit shall have the meaning ascribed to that term in the relevant first-day motion or application

## H. FACTUAL BACKGROUND

5.    The Debtor is the owner and operator of a residential apartment project located in Pittsburgh, Pennsylvania, known as "Berkley Manor Apartments".

6.    Berkley Manor Apartments were constructed in 2001 as a rental apartment community, and was purchased by the Debtor in 2006 for approximately $28,000,000.00.

7.    Berkley Manor Apartments is comprised of 252 residential rental apartment units located in 12 buildings spread over 63 acres. In addition, the complex contains a clubhouse.

8.    Residential apartment units at Berkley Manor Apartments lease for rentals ranging from $749.00 to $1,800.00 per month. Leases for residential apartment units are for terms from three months to one year.

9.    The Debtor's operational and profitability problems are principally due to the general economic problems of the country over the last several years which has resulted in periodic declines in occupancy levels, and the extended time required to bring occupancy levels back to proper levels. This has been exacerbated in Debtor's case by reason of fixed interest rate financing at levels substantially above current interest levels.

DB2192

10.     From time to time prior to the petition date, Debtor borrowed money and received other financial accommodations from Anglo-Irish Bank Corporation Limited ("Bank"), under that certain Promissory Note dated March 20, 2007, in the original principal amount of $30,500,000 (the "Bank Note") and that certain Open End Real Property Mortgage, Security Agreement and Assignment of Rents and Leases dated March 20, 2007, and incurred additional obligations in connection therewith, including but not limited to obligations for payment of certain of the Bank's fees, costs and expenses (the "Bank Obligations").

11.     The Bank Obligations under the Bank Loan Documents are secured by security interests and liens in and against the majority of the assets of the Debtor in favor of the Bank (the "Bank Prepetition Collateral"). The Bank Note and the security interests and liens in and against the Bank Prepetition Collateral securing the Bank Obligations are evidenced by certain loan, security and other collateral agreements between the Debtor and the Bank, as they may have been amended from time to time (the "Bank Agreements").

12.     The Bank has perfected its security interests and liens in and against the Bank Prepetition Collateral by the recording of mortgages and/or the filing of financing statements and other documents as applicable in the appropriate filing and recording offices.

13.     That as of the Petition Date, the aggregate outstanding principal amount of Bank Obligations was approximately $28,000,000.00.

## III. FIRST-DAY MOTIONS AND APPLICATIONS

14. An important and, in some cases, critical element in the Debtor's strategy of preserving the going concern value of its assets is approval of certain of the Debtor's first-day motions and applications filed contemporaneously with this Affidavit. To further this strategy, the Debtor requests that first-day orders of the types mentioned below be entered. Factual information in

support of the first-day motions and applications is provided below:

**A.    Retention of the Debtor's Professionals**

15.    The Debtor has requested the appointment of Robbins, Salomon & Patt, Ltd. ("RSP") to serve as counsel to the Debtor and aid in the administration of the Case. I believe that the Debtor's retention of RSP is essential to the success of the Case.

16.    RSP originally began performing legal services for Debtor at its inception and began performing legal services for the undersigned and certain of his affiliates, in approximately 1980. Prior to the commencement of this chapter 11 case, the Debtor used the services of RSP for all legal matters related to its business. Prior to the commencement of this case, Debtor sought the services of RSP with respect to, among other things, advice regarding restructuring matters in general and preparation for the potential commencement and prosecution of chapter 11 cases for the Debtors. As of September 11, 2009, RSP began performing these legal services pursuant to an engagement agreement between Debtor and RSP, a copy of which is made an exhibit to the Motion to employ RSP, filed herein (the "Engagement Agreement").

17.    The Debtor believes that continued representation by RSP is critical to the Debtor's efforts to restructure its business because RSP is intimately familiar with the Debtor's business, legal, and financial affairs and is well-suited to guide the Debtor through the chapter 11 process.

18.    The Debtor selected the firm of RSP as attorneys because of the firm's extensive experience and knowledge in the fields of real estate, debtors' and creditors' rights, business

DB2192

reorganizations under chapter 11 of the Bankruptcy Code, the challenges facing the Debtor's industry, the legal and bankruptcy issues that arise in such cases, and the interests of all stakeholders in such cases.

19.      Debtor desires to employ the firm of RSP under a general retainer because of the extensive legal services that will be required in connection with this chapter 11 case and the firm's familiarity with the business of the Debtor.

20.      The Debtor has requested the appointment of William E. Huml & Co. ("Huml") to serve as accountants to the Debtor and aid in the administration of the Case. I believe that the Debtor's retention of Huml is essential to the success of the Case.

21.      Huml originally began performing accounting services for the Debtor upon its inception and continues to perform all accounting services for Debtor.

22.      The Debtor believes that continued professional services by Huml is critical to the Debtor's efforts to restructure its business because Huml is familiar with the Debtor's business, accounting, and financial affairs and is well-suited to assist the Debtor through the chapter 11 process.

23.      The Debtor selected Huml as accountants because of the firm's experience and knowledge of the Debtor's business, as well as in the field of business reorganizations under chapter 11 of the Bankruptcy Code and the challenges facing the real estate industry in which the Debtor is engaged, the accounting issues that arise in such cases, and the interests of all stakeholders in such cases.

24.      The Debtor desires to employ Huml under a general retainer because of the extensive accounting services that will be required in connection with its chapter 11 case, the firm's familiarity

DB2192

with the business of the Debtor, and the firm's qualifications to act in the capacity of accountants for the Debtor.

**B.      Motion to Authorize Use of Cash Collateral and Provide Adequate Protection**

25.      As described above, prior to the Petition Date, Debtor borrowed money and received other financial accommodations from the Bank and granted the Bank security interests and liens in and against substantially all of the Debtor's assets.      As stated above, the total amount of the Bank Obligations outstanding as of the Petition Date was approximately $55,000,000.

26.      Pursuant to sections 363(a) and 552(b) of the Bankruptcy Code, certain cash and cash equivalents held by the Debtor as of the commencement of the above-captioned bankruptcy cases (the "Cases") and the proceeds, products, offspring, rents or profits of the Prepetition Collateral received by the Debtor after the commencement of the Cases constitute "cash collateral" within the meaning of section 363(a) of the Bankruptcy Code and the Bank has an interest within the meaning of sections 363(c)(2) and 363(e) (the "Cash Collateral").

27.      The Debtor's operations will generate substantial cash from rental payments, which constitutes cash collateral which the Debtor wishes to use to maintain and preserve its property and operate its business.

28.      The Interim Cash Collateral Order will provide that the Bank will receive adequate protection payments that will include payment of all rental income received in excess of the amount necessary to pay for the maintenance and preservation of the Debtor's apartment project, including payment of real estate taxes, all as detailed in periodic budgets. These payments will adequately protect the Bank as one hundred percent (100%) is being used to preserve its collateral, generate new cash collateral or in payment to the Bank. The Debtor believes, however, that characterization of the payments should be determined at a later time.

DB2192

29.    The Bank's collateral should not decline in value during the initial exclusive period of 120 days for the Debtor to file a plan of reorganization pursuant to Section 1121(b) of the Bankruptcy Code. Moreover, because it appears likely that the Bank is substantially over-secured, the additional equity is additional adequate protection for the Bank.

30.    The Bank additionally will be adequately protected not only by the payment of excess rental income, but by the grant of a replacement lien in the Debtor's assets as more specifically described in the Debtor's motion to use cash collateral filed herein.

31.    The Debtor has determined that the use of the Cash Collateral is necessary for the Debtor to maintain sufficient liquidity so that it may continue to operate its business in chapter 11. Without immediate access to the Cash Collateral, the Debtor will not be able to pay the ongoing costs of running its business, maintaining its assets and administering its estates, the result of which will be the irreparable damage to the value of the Debtor and thus the value of the Bank's collateral. Indeed, the Debtor has determined that if it is not allowed the use of the Cash Collateral, it could not maintain its business, and its case likely would be converted to a case under chapter 7 of the Bankruptcy Code in relatively short order.

32. Access to the Cash Collateral will provide the Debtor's tenants, vendors, and employees with the requisite security that the Debtor will be able to continue conducting its business in the ordinary course without interruption. Moreover, access to the Cash Collateral will enable the Debtor to further maximize the value of its assets for the Bank, its estate and its creditors.

33.    The Debtor's request for interim use of Cash Collateral pursuant to the Interim Cash Collateral Order is necessary to avoid immediate and irreparable harm to the Debtor. To ensure a smooth transition into chapter 11 and the maximization of the value of the Debtor's assets, it is imperative that the Debtor be authorized to use Cash Collateral pursuant to section 363 of the

DB2192

Bankruptcy Code to avoid immediate and irreparable harm to the Debtor's estate.

34.      Absent the use of Cash Collateral for its continuing business operations, the Debtor
will be unable to fund its operating expenses in the ordinary course, which would likely result in a
shutdown of operations from which it could not recover. Consequently, if interim relief is not
obtained, the Debtor's attempt to reorganize may well be doomed at the outset, to the detriment of
the Debtor's estates and creditors.

## C.      Payment of the Debtors' Prepetition Wages and Benefits.

35.      As of the Petition Date, the Debtor employs approximately 8 active Employees who
provide a myriad of services to the Debtor. 7 of the Employees are full-time, and one is part time.

36.      The average bi-weekly payroll for the Debtor's Employees is approximately
$11,000.00. The Debtor's bi-weekly payroll is funded one week in arrears.

37.      The Debtor estimates that it is obligated to pay approximately $3,0400.00 in pre-
petition wages, including the Debtors' portion of payroll taxes.

38.      The Debtor offers its Employees other forms of compensation, including vacation
pay, paid holidays, paid sick time and other earned time off, and reimbursement of certain business
expenses. These forms of compensation are usual, customary and necessary if the Debtor is to retain
qualified employees to operate its business.

(a)      Expense Reimbursement. Employees are entitled to reimbursement of certain limited
categories of expenses incurred in the ordinary course of business. The Debtors routinely reimburse
Employees for certain expenses incurred within the scope of their employment, including expenses
for travel, lodging, automobile allowance, ground transportation, meals, supplies, and miscellaneous
business expenses (collectively, the "Reimburseable Expenses").

Certain Employees have not yet been reimbursed for Reimbursable Expenses previously

DB2192

incurred. The majority of the Reimbursable Expenses have been incurred through the use of Employees' personal accounts. The Employees submit receipts for reimbursement which are processed through the normal expense report and accounts payable process. It is difficult for the Debtors to estimate the amount of Reimbursable Expenses outstanding as of the Petition Date because not all Employees have submitted expense reports as of the Petition Date. It is critical that the Debtors be authorized to reimburse all such expenses as and when reports are submitted. By this Motion, the Debtors therefore seek authority to pay all prepetition Reimbursable Expenses, in the ordinary course of business.

39. The Debtor offers its Employees other forms of compensation, including medical and dental plans, life insurance. These forms of compensation are usual, customary and necessary if the Debtors are to retain qualified employees to operate their businesses.

(a) <u>Medical and Dental Plans.</u> The Debtor provides primary health coverage for all Employees and their eligible dependants. Three persons are covered under the Debtor's Medical Plan, including 3 Employees, no former employees under Cobra and no Employee dependents. Four persons are covered under the Debtor's Dental Plan, including 4 Employees, no former employees under Cobra and no Employee dependents. In general, all Employees are eligible for the benefits described herein after 61 days of service with the Debtors.

(b) <u>Life Insurance.</u> The Debtor offers a life insurance plan (the <u>"Life Insurance Plan"</u>) to all Employees pursuant to policies issued through the Assurance Agency. Four persons are covered under the Debtor's Life Insurance, including 4 Employees, no former employees under Cobra and no Employee dependents. The Debtor's average monthly expense with respect to the Life Insurance Plan is $40.00.

40. The Debtor withholds from Employee paychecks amounts that the Debtor is required

DB2192

to transmit to third parties. Examples of such withholding may include Social Security, FICA, federal, state and local income taxes, child support obligations, garnishments, health care payments, and charitable donations. The Debtor believes that such withheld funds, to the extent that they remain in the Debtor's possession, constitute monies held in trust and therefore are not property of the Debtor's bankruptcy estates. Accordingly, the Debtor believes that its practice of directing such funds to the appropriate parties is in the ordinary course of business, and seek authority to continue such practice.

41.     Sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code require that certain claims for prepetition wages, salaries, commissions, vacation, severance, sick leave, and employee benefit contributions be accorded priority in payment in an amount not to exceed \$10,950.00 for any single employee. Because of the large number of Employees that work for the Debtor, because there are multiple payroll cycles, and because some amounts due Employees are unknown pending submission of claims, it would be administratively burdensome and highly impractical to pinpoint the exact prepetition amount owing to each individual Employee while still making timely payroll payments on the existing payroll schedule. All of the Debtor's Employees are owed amounts that are under the \$10,950 priority cap set forth in sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code. As such, payment of the Prepetition Wages and Benefits in the ordinary course of business should neither prejudice general unsecured creditors nor materially affect the Debtor's estate, because section 507(a)(4) and section 507(a)(5) priority claims are already entitled to payment in full under a reorganization plan. *See* II U.S.C. § 1129(a)(9)(B).

42.     Most importantly, the Debtor's ability to preserve its business and ultimately to reorganize is dependent upon the continued service, satisfaction, and loyalty of its Employees. The Debtor and its creditors therefore will be adversely affected if the Debtor is unable to retain its Employees.

DB2192

43.    In order to retain its Employees and maintain morale, the Debtor must have authority to pay or otherwise satisfy all Prepetition Wages and Benefits as summarized above. The amounts to be paid to Employees pursuant to this Motion are reasonable compared with the importance and necessity of the Employees and the losses the Debtor will likely suffer if these amounts are not paid.

44.    Finally, the relief requested will also significantly reduce the administrative burden which might otherwise be imposed in these cases. For the Debtor to identify the extent to which individual Employees hold priority or general unsecured claims for employee benefits, and to modify benefit policies to enforce these distinctions, would impose additional burdens of administration and expenses which are unwarranted under the circumstances.

## D.    Continuing Workers' Compensation Program and other Insurance Programs

45.    In connection with the operation of its business, the Debtor maintains insurance policies and related workers' compensation programs with Harleysvilee/CAN Insurance, CNA Insurance, PHCS and Assurant. Attached as Exhibit B are a certificate and evidence of Debtors' insurance policies (the "Insurance Policies"), along with schedules of continuing premium obligations. The Insurance Policies include coverage for claims currently or potentially involving workers' compensation, automobile, fiduciary liability, crime, directors' and officers' liability and securities, general liability, excess liability, and various property-related liabilities.

46.    Under the laws of the states in which it operates, Debtor is required to maintain workers' compensation policies and programs to provide its employees with workers' compensation coverage for claims arising from or related to their employment with the Debtor. Debtors' current primary workers' compensation policy is provided Assurance Agency.  Employees who are injured while working for the Debtor submit their claims and receive appropriate payments directly from the insurance company. The premium for the Workers' Compensation Program is based on estimated

DB2192

payroll. Following an annual audit of the Debtor's payroll, Debtor either pays a retrospective premium owed or receives back overpayments that were made.

47.    The Debtor also maintains many other insurance policies, which provide the Debtor with insurance coverage for claims relating to, among other things, commercial general, excess liability, commercial umbrella liability, directors' and officers' liability, fiduciary liability, commercial crime, and property (including business interruption, floods, earthquakes, and wind). These policies are essential to the ongoing operation of the Debtor's business.

48.    Sound business reasons exist for the Debtor to pay premiums under the Insurance Agreements pending its decisions as to whether assuming or rejecting the Insurance Agreements is in the best interests of its estate. The Debtor cannot operate its business without the Insurance Agreements and any interruption in the Debtor's insurance coverage would have a substantial adverse impact upon the Debtor's ability to retain its workforce, maintain its business operations and assets, and mitigate its liabilities. As stated above, the Debtor must have workers' compensation insurance in order to operate; otherwise, the Debtor could be subject to potential damage claims from employee lawsuits and/or their business operations could be enjoined. Payment of premiums due or to become due under the Insurance Agreements is the only viable way to ensure that the Debtor's insurance coverage is maintained and is not interrupted, thereby preventing the Debtor from incurring any unnecessary exposure.

## E.    Providing Adequate Assurance to Utilities

49.    In the normal course of its business operations, the Debtor obtains fuel, natural gas, heat, electricity, water, sewer, telephone, cable, telecommunications, Internet, paging, cellular phone, and other services of the same general type or nature (the "Utility Services") provided by various utility companies and other providers (each a "Utility Company" and, collectively, the "Utility

DB2192

FURTHER AFFIANT SAYETH NOT.

IVAN DJURIN

Executed in Lake Forest, Illinois

Suberibed to and sworn before on this *3*th
day of November, 2009

Illinois Notary Public

(SEAL)

"OFFICIAL   SEAL"
NADA HOPE JOVICIN
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 12/4/2011